**William G. WEST, Chapter 7 Trustee of Classic Contractors of Houston, Ltd. and Classic GP, L.L.C., and Western Surety Company, Appellant**

v.

**TRIPLE B SERVICES, LLP, Appellee.**

**No. 14–07–00082–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 26, 2008.

---

5. Having sustained appellant's second issue regarding occupancy, appellant's remaining issues are rendered moot.

Charles E. Fitch, Nancy Hesse Hamren, Houston, for appellants.

Leslie M. Henry, W. Jason Walker, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FOWLER and BOYCE.

## OPINION

WANDA McKEE FOWLER, Justice.

In four issues, appellant William G. West, Chapter 7 Trustee of Classic Contractors of Houston, Ltd. and Classic GP, L.L.C., appeals the trial court's judgment in favor of appellee Triple B Services, LLP ("Triple B"), the plaintiff below, for damages arising out of Triple B's contract with the Classic entities ("Classic") to construct a lift station for a residential subdivision. In two issues, appellant Western Surety Company ("Western") appeals the trial court's judgment awarding judgment against it in a sum greater than the face amount of the bond. For the reasons explained below, we affirm the trial court's judgment as modified.

**Factual and Procedural Background**

Classic owned an approximately sixty-acre tract of land in the Kingwood area of Harris County, Texas, which it intended to develop as the North Kingwood Forest subdivision. The property, which had been annexed by the City of Houston in 2000, was located within the boundaries of a tax increment reinvestment zone ("TIRZ"), created by the City of Houston, known as TIRZ No. 10. Under the agreement between Classic and TIRZ No. 10, Classic was to construct certain infrastructure improvements and, after completion, the City of Houston would own these improvements. The City, in turn, would reimburse Classic's costs to construct the improvements.

Part of the infrastructure to be completed was the construction of water, sanitary sewer and drainage ("WS & D") facilities. Another part of the infrastructure, and the part at issue here, was the construction of a lift station. A lift station is designed to collect outflow from the sanitary sewer lines and lift the effluent so that gravity will cause it to flow to a water treatment plant. A lift station has three main components: a wet well, pumps and controls that monitor the level of fluid, and landscaping and fencing.

Classic hired the engineering firm of Carter & Burgess, Inc. ("C & B") to design the drawings and plans for the WS & D facilities and the lift station. After the drawings were prepared by C & B, they were submitted to the City of Houston for approval. These plans, including the plans

for the lift station, were approved by the City of Houston.

C & B prepared the contract and served as Classic's representative and agent for the project. The contract provided that the project was "designed by [C & B] who is hereinafter called ENGINEER and who is to act as OWNER'S representative, assume all duties and responsibilities and have the rights and authority assigned to ENGINEER in the Contract Documents in connection with completion of the Work in accordance with the Contract Documents." Collin Pier of C & B was the project manager assigned to the project.

Following a bidding process, Triple B was awarded the contract for the construction of the WS & D facilities and the lift station. The contract provided that the WS & D work was to be substantially completed within 90 days after the contract times commenced to run, and completed within 105 days. The lift station work was to be substantially completed within 120 days and completed within 135 days. The contract also specified that time was of the essence, and provided for liquidated damages of $1,100 per day that the work remained uncompleted.

On August 5, 2002, C & B issued a Notice to Proceed to Triple B, informing it that the contract times would commence running the next day. Later, when Triple B's subcontractor, Peltier Brothers Construction, Inc., tried to obtain a permit for the lift station construction, the City refused to issue the permit. The City contended that there were two problems with the lift station. First, it was being constructed on private property, but the agreement between Classic and TIRZ No. 10 provided that the lift station and the other improvements ultimately were to be owned and operated by the City. Second, the City had different and higher design and building standards for lift stations that it was going to own and operate. Consequently, the City refused to issue a permit until the lift station drawings were revised. The City acknowledged that it had erroneously approved the original plans for the lift station, explaining that when it approved the plans, apparently it did not understand that it was going to own and operate the lift station.

Without a permit or approved plans for the lift station, Triple B was unable to work on the lift station for some time. After discussions with Collin Pier about the changes that the City would require, Triple B was able to determine the cost of the changes, and a revision of the contract price for the changes was memorialized in Change Order No. 3. Both Triple B and Classic signed Change Order No. 3, which reflected an increase of nearly $75,000 in the contract price. No increase in the contract time was included in the change order.[1] At C & B's request, Triple B moved ahead with the installation of the wet well portion of the lift station, and sunk the wet well in November 2002. After various delays, Triple B substantially completed its work on the lift station in November 2003.

The City eventually approved the construction drawings and issued a permit on May 14, 2003. According to Pier, as the project progressed, everyone understood that there was a delay caused by the City's refusal to issue a permit, and that the

---

1. Triple B's Exhibit 21 included a letter, dated January 16, 2003, from Stacy Kelly of Triple B to Collin Pier, enclosing a cost breakdown relating to Change Order No. 3 and requesting "one hundred calendar days be added to our contract." Keith Burke of Triple B testified that the letter was faxed to Pier. However, Pier testified that he did not recall receiving the letter, and so did not respond to it.

contract time did not run until the permit was issued.

Periodically, Triple B prepared pay estimates requesting payment as work progressed. Triple B submitted these pay estimates to C & B, which would review them and forward them to Classic and TIRZ No. 10 with a recommendation that Classic pay Triple B. Pay Estimate No. 9, for Triple B's work through May 31, 2003, reflected that Triple B was 92 ½ days over the contract time allowed for the completion of its work.[2] Classic nevertheless paid Triple B, just as it had paid all previous pay requests. In February 2004, C & B forwarded Pay Estimate No. 10, recommending that Triple B be paid a final payment of $82,827.71, representing the amount of the retainage. Pay Estimate No. 10, like No. 9, also reflected that Triple B was 92 ½ days over the contract time allowed. However, this time, Classic refused to pay, questioning the number of days over the allowed contract time.

C & B then submitted a revised Pay Estimate No. 10, which did not reflect any time exceeding the contract time. C & B's cover letter explained that "Triple B Services completed the Water Distribution, Sanitary Sewer, Storm Sewer Facilities and Lift Station within the allocated contract times" and elaborated on the reasons for the delays. In a second revision to Pay Estimate No. 10, C & B explained that the original pay estimate request "was inadvertently approved for payment with a mistake in the project timeline." C & B also repeated that Triple B had completed its work within the allocated contract times, provided some additional reasons for the various delays, and again recommended payment of the $82,827.71 in retainage. Classic continued to refuse to

pay, and in response, Triple B filed an affidavit claiming a lien on the property.

Shortly after filing the lien, Triple B sued Classic for breach of contract, quantum meruit, and foreclosure on its lien. Triple B sought damages of $82,827.71, the amount of the unpaid retainage, attorney's fees, and pre- and post-judgment interest. Classic then filed a release of lien bond that it obtained from Western Surety. The face amount of the bond was $124,241.56. Triple B amended its petition to add Western Surety as a defendant. Classic subsequently filed a counterclaim against Triple B for liquidated damages under the contract.

With the parties' agreement, the trial court ordered separate trials on Triple B's and Classic's claims. In the first trial, the court would determine whether Triple B was entitled to prevail on its affirmative claims. If the trial court found that Triple B breached the contract, then the second trial would determine Classic's damages.

Following a two-day bench trial, the trial court signed findings of fact and conclusions of law and awarded Triple B $82,827.71 in actual damages against Classic and Western Surety, jointly and severally. The court also awarded Triple B attorney's fees totaling $98,500 pursuant to Chapter 53 of the Texas Property Code, pre- and post-judgment interest, and court costs. Western Surety subsequently paid to Triple B the amount of the bond and three months' worth of post-judgment interest in partial satisfaction of the judgment, reserving the right to appeal the judgment as to any amounts in excess of the amount of the bond.

On February 6, 2007, Classic was placed into an involuntary bankruptcy proceeding. An Order for Relief was subsequently en-

---

**2.** Keith Burke of Triple B testified that the number of days over contract time was auto-matically generated on the document by the company's computer software.

tered on March 15, 2007, and William G. West was appointed as the Chapter 7 Trustee of Classic.

**Analysis of Classic's Issues**

On appeal, Classic raises four issues: (1) there is no evidence or factually insufficient evidence that Triple B timely completed its performance for construction of the lift station under the contract; (2) there is no evidence or factually insufficient evidence to excuse Triple B from complying with the contract provisions requiring it to timely apply for extensions of time for completing its work; (3) there is no evidence or factually insufficient evidence that Classic waived any terms of the contract, including the requirement that Triple B achieve substantial and final completion of the lift station with the contract time specified after the notice to proceed was issued; and (4) the trial court erred in rendering judgment against Classic for any attorney's fees that exceeded the face amount of Western Surety's bond.

As explained below, our resolution of Classic's first and second issue disposes of the third issue, because we determine that the evidence was legally and factually sufficient to support the trial court's holding that Classic was liable for breach of contract. We do not reach the issue whether the trial court's award of attorney's fees against Classic under Chapter 53 was error, because we conclude that, alternatively, the award is appropriate under Chapter 38 of the Civil Practice and Remedies Code.

**I. Classic's Legal and Factual Sufficiency Challenges**

A. *The Standard of Review and Applicable Law*

Findings of fact in a bench trial have the same force and dignity as a jury's verdict upon questions and are reviewed for legal and factual sufficiency of the evidence by the same standards. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). We review the trial court's legal conclusions de novo. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002).

When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810; *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). The fact finder is the sole judge of witness credibility and the weight to give testimony. *See City of Keller,* 168 S.W.3d at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly

wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). In our review, we may not substitute our own judgment for that of the trier of fact or pass upon the credibility of the witnesses. *See Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet,* 61 S.W.3d at 616.

To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach. *See Valero Mktg. & Supply Co. v. Kalama Int'l,* 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.). A breach occurs when a party fails or refuses to do something he has promised to do. *Townewest Homeowners Ass'n, Inc. v. Warner Commc'n Inc.,* 826 S.W.2d 638, 640 (Tex.App.-Houston [14th Dist.] 1992, no writ). When one party to a contract commits a material breach of that contract, the other party is excused from further performance under the contract.

*See Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 692 (Tex.1994).

**B.** *The Trial Court Did Not Err in Finding that Classic is Liable for Breach of Contract*

In its first and second issues, which it argues together, Classic contends that the trial court erred in finding it liable for breach of contract, because there is no evidence, or factually insufficient evidence, that Triple B timely completed its performance under the contract or that Triple B was excused from timely performing. In response, Triple B contends that Classic committed a prior breach of contract by requiring Triple B to work with plans that were not approved or that lost prior approval, which prevented Triple B from obtaining permits.

Under the contract, Triple B was to substantially complete the lift station within 120 days, and finally complete it within 135 days after the work commenced. According to Classic, it took Triple B approximately 249 ½ days to complete the lift station (accounting for approved extensions), rather than the 135 days called for in the contract.[3] The crux of Classic's argument is that, under the General Conditions that were incorporated into the contract, the contract times could only be changed by a change order or a written amendment, and the lack of a proper request for, and granting of, additional days is a condition precedent to recovery which Triple B failed to satisfy.[4] Classic points

---

**3.** In connection with this argument, Classic states that completion of the contract within the required time was a condition precedent to any recovery by Triple B that was not satisfied; further, Classic points out that the parties specifically agreed in the contract that "time is of the essence."

**4.** Article 12 of the General Conditions, on which Classic relies, provides in relevant part:
    12.1. The Contract Times (or Milestones) may only be changed by a Change Order or a Written Amendment. Any claim for an adjustment of the Contract Times (or Milestones) shall be based on written notice delivered by the party making the claim to the other party and to ENGINEER promptly (but in no event later than thirty days) after the occurrence of the event giving rise to the claim and stating the general nature of the claim.... No claim for an adjustment in the Contract Times (or Milestones) will be valid if not submitted in accordance with the requirements of this paragraph 12.1.

to the evidence that, although Triple B had requested and received approved extensions for other reasons, it never requested any additional contract time to be added for any delays caused by the delay in obtaining permits for the lift station, and Triple B's own documentation showed that it was 92½ days over the permitted contract time.

Classic further contends that Triple B's actions are not excused by the delay in obtaining a permit from the City of Houston based on the plans Classic provided, because the delay did not prevent Triple B from commencing the construction of the lift station, the plans were approved by the City before Classic and Triple B entered into the contract, and Triple B did not avail itself of the contractually mandated procedure for adjusting the amount of contract time. Consequently, Classic contends the trial court's judgment should be reversed and rendered that Triple B breached the contract, and the case should be remanded for a trial to determine Clas-

sic's damages, including its claim under the liquidated damages provision of the contract for at least $290,950.[5]

Triple B responds that the evidence is legally and factually sufficient to show that Classic failed to provide it with approved plans for the construction of the lift station so that Triple B could obtain a building permit and know what to build. Triple B contends that this was a material breach of the contract, which prevented it from working on the lift station. Consequently, Triple B asserts, it was excused from performing under the contract, and Classic, as the party in breach, may not contend that Triple B violated the contract's terms.

Under the contract, Triple B, the contractor, was required to complete the lift station "as specified or indicated in the Contract Documents." Collin Pier, the project manager for C & B, testified that Triple B's performance under the contract was conditioned on approval of the plans for the lift station and the requisite per-

12.2. All time limits stated in the Contract Documents are of the essence of the Agreement.

12.3 Where CONTRACTOR is prevented from completing any part of the Work within the Contract Times (or Milestones) due to delay beyond the control of the CONTRACTOR, the Contract Times (or Milestones) will be extended in an amount equal to the time lost due to such delay if a claim is made therefore as provided in paragraph 12.1.

5. In connection with its first two issues, Classic contends, in a blanket fashion, that there is no evidence, or factually insufficient evidence, to support Finding of Fact Nos. 18–22, 24–25, 27, 30, 33, 35–43, 46–48, 51, 59–60, 67, 69, 71, 76–77, 79–80, 89–91, 104–105, 109–15, 123–24, and to the extent they constitute findings of fact, Conclusions of Law 1–3, 5–7, 11–22, 26–28, 31–37. However, Classic separately challenges the trial court's Conclusion of Law No. 26, in which the court stated as follows: "All provisions in the Contract requiring Triple B to give Classic notice of a

claim for damages, delays or an occurrence giving rise to damages or delays, including requests for contract time extensions, within less than 90 days is void under Tex. Civ. Prac. & Rem.Code § 16.071." Section 16.071 provides: "A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void." TEX. CIV. PRAC. & REM.CODE § 16.071(a). Classic contends that section 16.071 does not apply to the contract because contracts obligating parties to pay in excess of $500,000 are excluded from the notice requirements. *See* § 16.071(f). Triple B responds that subsection 16.071(f) only applies to "a contract relating to the sale or purchase of a business entity." *See id.* We agree with Triple B that the plain language of section 16.071(f) does not provide an exception that applies in this case. We express no opinion concerning the applicability of section 16.071 to the contract beyond the parties' arguments.

mits.[6] The contract documents likewise reflect that the plans for the lift station were incorporated into the contract. In the contract, the list of "Contract Documents" includes the "Construction Plans for Lift Station No. 1 to serve North Kingwood Forest." Additionally, the General Conditions includes the specifications and drawings for the work in the definition of "Contract Documents."[7] Paragraph 3.3.2 of the Contract's General Conditions governs errors and discrepancies within the contract documents. That section provides as follows:

> If, during the performance of the Work, CONTRACTOR discovers *any conflict, error, ambiguity or discrepancy within the Contract Documents* or between the Contract Documents and any provision of any such Law or Regulation applicable to the performance of the Work or of any such standard, specification, manual or code or of any instruction of any Supplier referred to in paragraph 6.5, CONTRACTOR shall report it to ENGINEER in writing at once, and *CONTRACTOR shall not proceed with the Work affected thereby* ... until an amendment or supplement to the Contract Documents has been issued by one of the methods indicated in paragraph 3.5 or 3.6. . . .

(emphasis added).

Pier testified that a contractor like Triple B has to have the City's Public Works Division approve the plans. After that, the City's Code Enforcement Division must give the contractor permits to begin actual construction. C & B issued the Notice to Proceed to Triple B on August 5, 2002. But, when Triple B's subcontractor took the plans to the City of Houston to obtain a permit for the lift station, the City refused to issue a permit because the property was not deeded to the City and the plans were inadequate. Without the required permits, Triple B was unable to work on the lift station for several months. Pier testified that the problem was not Triple B's fault.[8]

Pier also testified that approved plans for the lift station were a prerequisite to issuing the Notice to Proceed. He explained that the counting of calendar days presumes that the contract for the lift station has begun to run, and that Triple B is actually able to perform work on the lift

---

**6.** Additionally, Classic does not challenge the trial court's Finding of Fact No. 17, which provides as follows: "Classic's issuance of Notice to Proceed was based and conditioned upon Classic providing Triple B with all of the documentation and information required under the Contract and the contract documents, including construction plans for the WS & D and the Lift Station that were approved by the City and all other required governmental entities."

**7.** Article 1.10 of the General Conditions provided as follows:

> Contract Documents—the Agreement, Addenda (which pertain to the Contract Documents), CONTRACTOR's Bid (including documentation accompanying the Bid and any post Bid documentation submitted prior to the Notice of Award) when attached as an exhibit to the Agreement, the Notice to Proceed, the Bonds, these General Conditions, the Supplementary Conditions, the Specifications and the Drawings as the same are more specifically identified in the Agreement, together with all Written Amendments, Change Orders, Work Change Directives, Field Orders and ENGINEER's written interpretations and clarifications issued pursuant to paragraphs 3.5, 3.6, and 3.6.3 on or after the Effective Date of the Agreement. . . .

**8.** In its appellate brief, Classic also concedes that "[i]t is unquestionably true that the action of the City of Houston Code Enforcement Department, in refusing to issue a permit on plans previously approved by the Public Works Department, was an occurrence of an event that was beyond the control of Triple B."

station. Pier further testified that the computation of days presumes that the Public Works & Engineering Department of the City has approved the lift station plans and that Code Enforcement has actually issued a building permit for the lift station. Pier confirmed that none of these things happened.

The importance of the plans was explained in the testimony of Keith Burke, the managing partner of Triple B:

Q: All right. Was having approved plans an important part of the contract in your mind?

A: The plans are our road map. The road map we rely on to complete the journey out there. And without plans, clearly defining what it is that the owner wants, how am I supposed to know what to build?

Similarly, Pier testified that the plans were an important part of the contract documents because they provide the information the contractor needs to construct the project.

After discussions among C & B, Triple B, and the City, the parties effectively agreed on and understood what modifications the City would require. The City indicated that construction could proceed, and C & B directed Triple B to commence construction. Eventually, the lift station was completed, and on November 18, 2003, the City of Houston completed its final inspection. Pay estimates were submitted for payment to Triple B of the retainage, and Classic refused to pay the amount of the retainage, $82,827.71.

Classic argues that Triple B's delay is not excused because Triple B never requested an extension of time for the delay in obtaining permits even though it was obligated to do so under the contract.[9] Further, Classic points to the pay applications as demonstrating that Triple B was able to work on the lift station before the permit was issued in May, 2003, and the testimony of Pier and Burke that the lack of a permit did not prevent the construction from occurring. However, the evidence is sufficient to show that Triple B's performance under the contract was conditioned on adequate and approved plans, but the plans were erroneously approved by the City of Houston and so were inadequate at the time Classic and Triple B entered into the contract. The inadequate plans prevented Triple B and its subcontractor from timely obtaining a permit to begin construction of the lift station, which prevented Triple B from constructing the lift station at the time the Notice to Proceed was issued. Thus, the evidence is legally and factually sufficient to enable the trial court to find that the lack of adequate plans was a material breach of the contract by Classic.

In an analogous case, *Board of Regents of the University of Texas v. S & G Construction Co.,* 529 S.W.2d 90 (Tex.Civ. App.-Austin 1975, writ ref'd n.r.e.), the court held that the owner's inability to provide valid plans and specifications constituted a prior material breach. *Id.* at 96. The court observed that the owner's conduct "was a breach of the contract resulting in the damage to appellee found by the jury." *Id.; see also Bd. of Regents of N.*

---

9. To support its claim that the failure to follow a contractually mandated procedure for securing extra time is fatal to Triple B's breach of contract claim, Classic cites *City of Houston v. R.F. Ball Construction Co.,* 570 S.W.2d 75 (Tex.Civ.App.-Houston [14th Dist.] 1978, writ ref'd n.r.e.). That case is distin-guishable because, in that case, the court held that a "no damages for delay" clause in the contract between the city and the contractor prevented the contractor from recovering damages for delays caused by city that were within the scope of the clause. *See id.* at 77–78.

*Tex. St. Univ. v. Denton Constr. Co.*, 652 S.W.2d 588, 590 (Tex.App.-Fort Worth 1983, writ ref'd n.r.e.). Further, this Court has held that "[w]hen an owner breaches a construction contract, it relinquishes its contractual procedural rights concerning change orders and claims for additional costs." *Shintech, Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144, 151 (Tex.App.-Houston [14th Dist.] 1985, no writ).

Classic attempts to distinguish *Board of Regents of the University of Texas v. S & G Construction Co.* by arguing that, in this case, the plans originally provided were not defective.[10] Classic points to Pier's testimony that the plans were "as close to perfect as could be" for the lift station, and that there were no errors in the plans. Further, the City of Houston had approved the plans, and it was only after the contract was executed that the City "changed its mind" and required modifications to the plans. However, Pier testified that City of Houston personnel informed him that the City had reviewed the drawings incorrectly because it did not understand that the lift station was going to be owned and operated by the City. City of Houston personnel also told him that the plans should not have been approved as designed. Consequently, Pier opined that Classic did not meet its obligations to Triple B under the contract, because it did not provide a set of drawings from which a permit could be obtained. Pier also testified that, before there was even a signed contract, the plans were not adequate for what the City ultimately required, and

Classic should never have issued the Notice to Proceed.

Thus, the evidence showed that the original plans did not comply with the requirements for infrastructure improvements in a subdivision development within a TIRZ, and for those reasons the plans were ultimately determined to be inadequate and Triple B's ability to obtain the requisite permits was delayed. Consequently, the evidence was legally and factually sufficient to enable the trial court to find that Classic committed a material breach of the contract that excused Triple B's further performance and forfeited Classic's right to demand that Triple B comply with the contract provisions concerning requests for additional time. And, it is undisputed that Classic refused to pay and did not pay the remaining retainage due under the contract.

Therefore, under the facts of this case, we hold that the evidence was legally and factually sufficient to support the trial court's judgment in favor of Triple B and against Classic. We overrule Classic's first three issues.

## C. The Trial Court Did Not Err in Rendering Judgment Against Classic for Attorney's Fees in Excess of the Face Amount of the Bond

In this issue, Classic challenges the trial court's Conclusion of Law No. 30, in which it concluded that Triple B was entitled to recover reasonable attorney's fees from Classic and Western Surety Company under Chapter 53 of the Texas Property Code. According to Classic, any judgment

10. Classic does not dispute that, as a matter of law, the contract imposed upon it the obligation to provide correct and adequate plans and specifications for the lift station. Further, Classic does not challenge the trial court's Finding of Fact No. 44, which provides as follows: "Classic had a duty under the Contract to provide Triple B with approved construction plans for the Lift Station so as to allow Triple [B] to secure a construction permit for construction of the Lift Station and, more importantly, provide it with instructions on what to build. This duty was a condition precedent to Triple B's performance under the Contract."

against either it or Western Surety for an amount exceeding the face amount of the bond is "not supportable," and there is no other finding that affords a basis for such an award. We understand Classic's contention to be that, because the trial court determined that the sole basis for an award of attorney's fees against Classic and Western Surety was under the bond issued pursuant to Chapter 53, any recovery against them is limited to the face amount [11] of the bond.

■ However, we need not address Classic's contention that the trial court erred in awarding the full amount of attorney's fees under Chapter 53, because the record supports an alternative basis for awarding the full amount of attorney's fees against Classic. Triple B's petition included a claim for breach of contract, and Triple B pleaded for attorney's fees under both Property Code section 53.156 and Civil Practice and Remedies Code section 38.001, which allows a party to recover reasonable attorney's fees for a valid claim on an oral or written contract. *See* Tex. Civ. Prac. & Rem.Code § 38.001(8). Further, in its findings of fact, the trial court found that Classic was liable to Triple B for breach of contract and that Triple B "incurred reasonable attorney fees in the amount of $98,500 in prosecuting its claims against Classic and Western Surety Company and in defending Classic's counterclaim through trial." Finally, the trial court concluded that Classic "is obligated to pay Triple B $82,827.71 as a result of Classic's breach of the Contract" and so "is ordered to pay Triple B reasonable attorney fees in the amount of $98,500 in connection with Triple B's claims...." [12] Therefore, the record supports the trial court's judgment against Classic for attorney's fees of $98,500 under Chapter 38 for Triple B's breach of contract claim, separate from the action on the bond. *See id.*

We therefore overrule Classic's fourth issue.

**Analysis of Western Surety's Issues**

Western Surety raises two issues on appeal: (1) the trial court erred by awarding judgment against it in an amount in excess of the face amount of the bond; and (2) the trial court erred by making certain findings of fact and conclusions of law, to the extent that they result in liability on the part of Western Surety in excess of the penal sum of the bond, because, as a matter of law, Western Surety's liability is limited to the penal sum of the bond.[13]

**I. Error in Awarding Judgment Against Western Surety in Excess of Face Amount of Bond**

The amount of the bond Western Surety issued to Classic under Chapter 53 was required to be in an amount that was one and one-half times the amount of the lien. *See* Tex. Prop.Code § 53.172(3) (providing that bond to indemnify against lien exceeding $40,000 must be in an amount that is

---

11. Case law and statutes sometimes refer to the "penalty" of the bond or the "penal sum" of the bond, which is another way of referring to the face amount of the bond. *See Colonial Am. Cas. & Surety Co. v. Scherer,* 214 S.W.3d 725, 730 n. 3 (Tex.App.-Austin 2007, no pet.).

12. The trial court also found, consistent with the procedures for recovery of attorney's fees under Texas Civil Practice and Remedies Code Chapter 38, that (1) Triple B was represented by any attorney in this matter, (2) on or about April 13, 2004, Triple B presented its $82,827.71 claim to Classic for payment, and (3) Classic failed to pay Triple B $82,827.71 within 30 days of Triple B's presentment of its claim. *See* Tex. Civ. Prac. & Rem.Code § 38.002. Classic does not challenge these findings of fact.

13. The challenged Findings of Fact are Nos. 108–109, 115, 119, 120, and 121–24. The challenged Conclusions of Law are 4, 29–30, and 38–39.

the greater of 1 ½ times the amount of the liens or the sum of $40,000 and the amount of the liens). Western Surety complains that the amount of the bond in this case was $124,241.56, but the judgment signed by the trial court awarded damages, including attorney's fees and pre-judgment interest, against Classic and Western Surety jointly and severally in the amount of $194,426.97, plus court costs and appellate attorney's fees. Western Surety contends, based on what it claims is well-settled law, that its liability is capped by the face amount of the bond, regardless of the amount of the judgment against its principal. In response, Triple B contends that the plain language of section 53.156 of the Property Code allows for an award of reasonable attorney's fees and costs in addition to actual damages, and the law Western Surety relies upon does not apply to Chapter 53. Therefore, we will begin our analysis of this issue by examining the applicable provisions of Chapter 53.[14]

Section 53.156 of the Texas Property Code governs costs and attorney's fees in lawsuits brought under Chapter 53. That section provides:

In any proceeding to foreclose a lien or to enforce a claim against a bond issued under Subchapter H, I, or J or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, *the court may award costs and reasonable attorney's fees as are equitable and just.*

TEX. PROP.CODE § 53.156 (footnote omitted) (emphasis added). Subchapter H to Chapter 53, which applies here, governs bonds to indemnify against a lien. *Id.* §§ 53.171–53.175. Section 53.172 provides that the bond must:

(1) describe the property on which the liens are claimed;

(2) refer to each lien claimed in a manner sufficient to identify it;

(3) be in an amount that is double the amount of the liens referred to in the bond unless the total amount claimed in the liens exceeds $40,000, in which case the bond must be in an amount that is the greater of 1½ times the amount of the liens or the sum of $40,000 and the amount of the liens;

(4) be payable to the parties claiming the liens;

(5) be executed by:

(A) the party filing the bond as principal; and

(B) a corporate surety authorized and admitted to do business under the law in this state and licensed by this state to execute the bond as surety, subject to Section 1, Chapter 87, Acts of the 56th

---

**14.** Statutory construction is a legal question that we review de novo, ascertaining and giving effect to the Legislature's intent as expressed by the plain and common meaning of the statute's words. *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 683 (Tex.2007). In construing a statute, our primary objective is to determine the Legislature's intent, which, when possible, we discern from the plain meaning of the words chosen. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006); *see also State v. Silver Chevrolet Pickup,* 140 S.W.3d 691, 693 (Tex.2004) (per curiam) (on review of civil forfeiture proceeding under Texas Code of Criminal Procedure Chapter 59, stating that the "most important rule of statutory construction" is "that the court must give effect to legislative intent" and the principle that forfeitures are strictly construed does not prevent a court from considering the purpose of a statutory provision). We presume that every word of a statute was used for a purpose, and, likewise, that every word excluded was excluded for a purpose. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981). We must consider the statute as a whole rather than its isolated provisions. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001); *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.,* 19 S.W.3d 393, 398 (Tex.2000).

Legislature, Regular Session, 1959 (Article 7.19–1, Vernon's Texas Insurance Code); and

(6) be conditioned substantially that the principal and sureties will pay to the named obligees or to their assignees the amount that the named obligees would have been entitled to recover if their claims had been proved to be valid and enforceable liens on the property.

*Id.* § 53.172.

Section 53.156 is contained in subchapter G of Chapter 53. Subchapter G, entitled "Release and Foreclosure; Action on Claim," addresses generally proceedings involving releases and foreclosure actions on mechanic's liens. Subsection H, which governs bonds to indemnify against such liens, prescribes the specific amount of an indemnity bond—in this case, one-and-one-half times the amount of the lien. *See id.* § 53.172(3). Although section 53.156 does plainly allow for the recovery of attorney's fees and costs in an action to enforce a claim against a bond, nothing in its language indicates a legislative intent to permit a recovery against a surety on an indemnity bond exceeding the face amount of the bond. That the Legislature chose to provide for an additional amount above the amount of the lien indicates that it intended the additional amount to be the extent of the surety's liability for any additional charges against it, which could include attorney's fees or costs under the bond. If this were not the Legislature's intent, it simply could have provided that a surety would be liable for all attorney's fees and costs, and there would be no requirement for the additional one-half of the lien amount.[15]

■ Triple B's argument would require us to conclude that the Legislature intended section 53.156, a general provision of a separate subchapter of Chapter 53, to override subchapter H's specific requirement that an indemnity bond be in a specified amount above the amount of the lien, and to effectively invalidate this legislatively prescribed upper limit on a party's recovery under an indemnity bond. We decline to so conclude. *Cf. Colonial Am. Cas. & Surety Co.,* 214 S.W.3d at 733 (holding that surety which issued administrator's bond could not be liable for attorney's fees in excess of face amount of bond, even though Probate Code statute was amended to provide for attorney's fees in actions against administrators of estates, because there was "no indication the legislature sought to override the general rule that a surety cannot be held liable beyond the express terms of its undertaking").

■ Moreover, Triple B's argument would directly conflict with the well-settled rule that a surety's liability generally is limited to the face amount of the bond. *See Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 426 (Tex.1995). This rule has been applied in a variety of contexts. *See, e.g., id.* at 426–27 (performance bond); *Abercia v. Kingvision Pay–Per–View, Ltd.,* 217 S.W.3d 688, 704–705 (Tex.App.-El Paso 2007, pet. denied) (constable's bond); *Colonial Am. Casualty & Surety Co.,* 214 S.W.3d at 734 (estate administrator's bond); *Ferguson v. Ferguson,* 69 S.W.2d 592, 595 (Tex.Civ. App.-Eastland 1934, no writ) (supersedeas

---

**15.** For the same reasons, we do not consider the language of section 53.172(6), requiring that the bond be conditioned substantially that the principal and sureties will pay the "amount that the named obligees would have been entitled to recover if their claims had been proved to be valid and enforceable liens on the property" a persuasive basis on which to conclude that the Legislature intended to override the limit on the amount of the bond. *See* Tex. Prop.Code § 53.172(6).

bond); *First Nat'l Bank of Brownfield v. Mass. Bonding & Ins. Co.,* 69 S.W.2d 151, 152–53 (Tex.Civ.App.-Amarillo 1934, writ ref'd) (warehouseman's bond); *Chesley v. Reinhardt,* 300 S.W. 973, 974 (Tex.Civ. App.-El Paso 1927, no writ) (bond in favor of insurance companies); *Locke v. Beal,* 257 S.W. 302, 302 (Tex.Civ.App.-Galveston 1923, no writ) (forcible entry and detainer bond). Apparently, no case to date has applied the general rule specifically to Property Code section 53.156. Triple B attempts to distinguish such cases by noting that they either pre-date Chapter 53 or do not involve section 53.156 specifically. But, Triple B offers no compelling reason why the indemnity bond at issue should be treated differently than the many other types of bonds to which the rule has been applied.

Triple B also argues that Chapter 53 trumps the common law, and because there is a conflict between Chapter 53 and the common law, Chapter 53 must control. *See Signal Oil & Gas Co. v. Universal Oil Prods.,* 572 S.W.2d 320, 330 (Tex.1978) ("Where the [Business and Commerce] Code is not in conflict with the prior common law of warranty, such law supplements the basic provisions of the Code."); *Bartley v. Guillot,* 990 S.W.2d 481, 485 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) ("Where the common law is revised by statute, the statute controls."). However, as we have explained, we disagree that section 53.156 plainly allows a recovery above the legislatively prescribed upper limit of an indemnity bond, and so we find no conflict between the statute and the general common-law rule.

Triple B further argues that we cannot look beyond the text of the statute—which it contends plainly permits awards of attorney's fees above the face amount of the bond—to speculate as to the Legislature's intent in enacting a statute. *See McIntyre*

*v. Ramirez,* 109 S.W.3d 741, 748 (Tex.2003) (noting that court's role in interpreting Good Samaritan statute was "not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent"); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 868 (Tex.1999) ("The Legislature's goal in crafting [the indemnity provision contained in the Texas Products Liability Act of 1993] cannot be known except as revealed in its text."). Triple B posits that if the Legislature intended section 53.156 to limit the recovery of attorney's fees to the face amount of the bond, it could have done so expressly, as it did in section 86.002 of the Texas Local Government Code. Section 86.002 provides that a constable's bond is set by the commissioner's court "in an amount of not less than $500 *or more than* $1,500." Tex. Loc. Gov't Code § 86.002(a) (emphasis added). But, as we have pointed out, Subchapter H also prescribes the upper limit of the indemnity bond at issue here. Thus, Triple B's argument is actually undercut by its reference to the constable's bond statute.

Triple B also points to Texas Transportation Code section 503.033, which provides for the recovery of attorney's fees in addition to damages against a surety, but expressly limits the surety's liability by providing that it "may not exceed the face value of the surety bond." *See* Tex. Transp. Code § 503.033(e)-(f). In the same section, this statute also requires that the amount of the bond be $25,000. *Id.* § 503.033(a). Because the amount of the bond is fixed, attorney's fees are provided for, and the surety's liability is limited to the amount of the bond all in the same section, Transportation Code section 503.033 leaves no ambiguity concerning the Legislature's intent. However, for the

reasons previously stated, we cannot conclude from this example that the Legislature intended something different when it enacted Property Code section 53.156. Moreover, we note that the express language of Transportation Code section 503.033 merely restates and applies the general rule concerning the limits on a surety's liability, which would be consistent with our construction of Property Code section 53.156.

Finally, Triple B argues that the interpretation of Chapter 53 proposed by Western Surety would lead to an absurd result, because it would enable a surety to limit its potential liability to the difference between actual damages and the face amount of the bond. Triple B contends that, because costs and attorney's fees can often exceed the difference between the face value of the bond and actual damages, public policy weighs against such a result because it would be neither equitable nor just. *See* TEX. PROP.CODE § 53.156 (providing trial court may award reasonable attorney's fees "as are equitable and just"). We acknowledge that limiting the recovery of costs and attorney's fees to the face amount of the bond could limit a contractor's potential recovery of costs and attorney's fees, but that is always a potential outcome when a party sues on a bond, unless there is some other statutory or contractual basis for a full recovery of costs and attorney's fees against the surety. Although Triple B perceives an unfairness in the result, it points to nothing that renders the result in this case any more "absurd" than the result reached in the weight of the authorities upholding the general rule limiting a surety's liability to the face amount of the bond.

Therefore, in the absence of any express language to the contrary, we hold that the Legislature did not intend Property Code section 53.156 to alter the general rule that the surety's liability is limited to the face amount of the bond. We sustain Western Surety's first issue.

## II. The Trial Court's Findings of Fact and Conclusions of Law

In its second issue, Western Surety attacks certain findings of fact and conclusions of law to the extent that they result in liability on its part in excess of the face amount of the bond, because, according to Western Surety, as a matter of law its liability is limited to the face amount of the bond.

### A. *Findings of Fact*

**Finding of Fact No. 108.** Western Surety contends that the trial court erred in finding that it is liable to Triple B for "any and all amounts that Classic is liable to Triple B under the statutory and constitutional liens." As explained above, we agree that Western has no liability to Triple B under the bond in excess of the face amount of the bond.

■■■ **Finding of Fact No. 109.** Western Surety contends that the trial court erred in finding that "Classic and Western Surety Company have each failed to pay any part of the $82,827.71 to which Triple B is entitled under the lien or constitutional lien," because Western's liability does not arise until such time that a judgment against Classic becomes final and Classic does not pay such judgment. This argument appears to be based on a condition of the bond that provides as follows:

"if the above bounden, *Classic Contractors of Houston, Ltd.* shall well and truly pay any and all judgments which may be rendered against the said property in favor of the aforesaid lienor, his successors or assigns, in any action or proceeding to enforce said lien, then this obligation shall be void, otherwise to remain in full force and effect."

However, Western Surety's brief contains no argument, analysis, or legal authorities to support its assertion. Therefore, because it is inadequately briefed, we overrule this sub-issue. *See* Tex.R.App. P. 38.1(h); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 337–38 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

**Finding of Fact No. 115.** Western Surety contends that the trial court erred in finding that "[a]ll conditions precedent to Triple B's claims an suit have occurred or been performed or satisfied, if not excused," to the extent it implies that Western's liability under the bond had arisen at the time of judgment and to the extent that it implies that Western might be liable for sums in excess of the penal sum of the bond. Although we have determined that Western Surety is not liable for any sums in excess of the face amount of the bond, we overrule the contention in this sub-issue that Western Surety's liability had not arisen at the time of judgment as inadequately briefed.

**Finding of Fact Nos. 119–122.** Western Surety complains that the trial court erred in making these findings of fact because suit against it was premature until such time that a final, non-appealable judgment is rendered against Classic and not thereafter paid by Classic:

No. 119: "Triple B has incurred attorneys' fees in connection with the prosecution of its claim against Classic and Western Surety Company and in connection with Classic's counterclaim against Triple B."

No. 120: "Attorneys fees incurred in prosecuting Triple B's claim against Classic and Western Surety Company are inextricably intertwined with those incurred in defending Classic's counterclaim against Triple B."

No. 121: "Triple B incurred reasonable attorney fees in the amount of $98,500.00 in prosecuting its claims against Classic and Western Surety Company and in defending Classic's counterclaim through trial."

No. 122: "Triple B will incur additional attorneys' fees of $20,000.00 in the event of an appeal to the court of appeals, $10,000.00 in the event of a petition to the Texas Supreme Court that is not granted and $10,000.00 more if the petition is granted but unsuccessful."

According to Western Surety, there was no need to file a claim against it and it had no liability under the bond at the time it was sued; therefore, any attorney's fees incurred by Triple B were not in connection with its claim against Western Surety, but rather, its claims against Classic.

Again, although we have determined that Western Surety is not liable for any sums in excess of the face amount of the bond, we overrule the contention in this sub-issue that Western Surety's liability had not arisen at the time of judgment as inadequately briefed.

**Finding of Fact Nos. 123–24.** Western Surety contends the trial court erred in finding that "Triple B has proven by a preponderance of the evidence and prevails on all its causes of action[ ], defenses and affirmative defenses against Classic, Classic GP, LLC, and Western Surety Company," and "Classic, Classic GP, LLC and Western Surety Company failed to prove by a preponderance of the evidence any of its causes of action, defenses and affirmative defenses against Triple B."

Western Surety complains of these findings of fact to the extent that (1) they imply that its liability under the bond arose at the time of judgment, (2) Western might be liable for sums in excess of the face amount of the bond, and (3) they imply that Western breached the condition of its bond, or is liable to Triple B under a

breach of contract theory. Western Surety further asserts that, as a matter of law, the condition of the bond was such that its liability does not arise until a final judgment is rendered against Classic which is not paid by Classic. Again, although we have determined that Western Surety is not liable for any sums in excess of the face amount of the bond (in response to (2) above), we overrule Western Surety's additional contentions as inadequately briefed.

## B. *Conclusions of Law*

Western Surety raises similar complaints concerning the following conclusions of law "in an abundance of caution":

No. 4: "Western Surety Company is obligated to pay Triple B $82,827.71, plus attorneys fees under the Bond."

No. 29: "Classic is ordered to pay Triple B reasonable attorney fees in the amount of 98,500.00 in connection with Triple B's claims against Classic and Western Surety Company and in defending Classic's counterclaim through trial."

No. 30: "Triple B is entitled to recover reasonable attorney fees from Classic and Western Surety Company under Chapter 53 of the Texas Property Code."

No. 38: "Classic and Western Surety Company are jointly and severally liable to Triple B under the Bond in the amount of $82,827.11, plus reasonable attorney's fees and interest."

No. 39: "Triple B is entitled to prejudgment interest to the maximum amount allowed by law."

We agree with Western Surety that these conclusions of law provide that Western Surety is liable to Triple B for costs and attorney's fees in an amount in excess of the face amount of the bond, whether individually or jointly and severally with Classic. We overrule all other contentions as inadequately briefed.

Accordingly, we sustain Western Surety's second issue to the extent that the trial court's findings of fact and conclusions of law identified above imply that Western Surety is liable for any costs or attorney's fees under Property Code section 53.156 in excess of the face amount of the bond, whether individually or jointly and severally with Classic. However, we overrule Western Surety's other arguments as inadequately briefed.

## Conclusion

We hold that the evidence is legally and factually sufficient to support the trial court's findings that Classic breached its contract with Triple B, and so we overrule Classic's first two issues and do not reach its third issue. We also do not reach Classic's fourth issue concerning whether the trial court's award of attorney's fees against Classic under Chapter 53 was error, because we conclude that, alternatively, the award is appropriate under Chapter 38 of the Civil Practice and Remedies Code. We also sustain Western Surety's two issues to the extent that the trial court's judgment ordered that Western Surety was liable for any amounts above $124,241.56, the face amount of the bond it issued to Classic. We therefore modify the trial court's judgment to limit Western Surety's liability to $124,241.56, and affirm the judgment as modified.