Affirmed as Modified and Memorandum Opinion filed July 15,
2010.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00050-CV



 

Quality Infusion Care, Inc., Appellant

V.

APC, Inc., Appellee

 



On Appeal from the 113th
District Court

Harris County, Texas

Trial Court Cause No. 2006-62927



 

MEMORANDUM OPINION

            Appellant,
Quality Infusion Care, Inc. (“QIC”), appeals from a judgment for $3,800 in
favor of appellee, APC, Inc. (“APC”), following a bench trial.  In five issues,
QIC contends the evidence is legally and factually insufficient to support the
trial court’s findings that QIC was negligent, breached the parties’ contract, and
committed fraud and conversion, or alternatively, there was no evidence to support
the damages award for conversion.  We modify the judgment to reduce the award
of damages from $3,800 to $2,000 and affirm as modified.

I.                  
Background

Whitney Broach is president of APC, a
company that performs micropigment implantation and laser tattoo removal.  In
late 2005, Broach began negotiating with Guy Hunt of QIC to lease office space
in QIC’s building.  The parties ultimately decided on a space, but an extensive
build-out would be necessary to satisfy APC’s needs.  On March 30, 2006, the
parties entered into a written “Lease Agreement.”  The agreement provided the
lease would commence on the date of substantial completion of the improvements
or May 1, 2006, whichever is later.  Further, APC was required to pay, on the
day the lease was executed, a security deposit of $8,619 equal to the first and
last month’s rent.  

Broach gave QIC a check dated March
29, 2006 for $8,619.  According to Broach, she and Hunt had an “understanding”
the check would not be negotiated, and she would deliver a cashier’s check to
replace it.  Broach testified she was concerned there might be insufficient
funds in her bank account because her mortgage company had double debited some
payments.  QIC did negotiate the check, and it was not honored due to
insufficient funds.  Broach remitted another check dated April 9, 2006 for
$7,619, which was actually the correct amount due because APC had already paid
$1,000 in conjunction with signing a letter of intent as a precursor to
execution of the lease.  Broach claimed she and Hunt had the same
“understanding” regarding this check, but it was also negotiated and returned
for insufficient funds.  

On April 17, 2006, Broach wrote to
Hunt responding to an inquiry about whether APC still intended to lease the
space.  She expressed her desire to consummate the lease and summarized her
expenses incurred thus far toward occupying the space, such as fees for an
architect and purchase of equipment.  With respect to the unpaid security
deposit, Broach said she was waiting on proceeds from a friend’s life insurance
policy and “[t]he only thing I can do in the meantime is pay you money over
several days until the rest of the deposit is paid.  If you do not want me to
have the space, then please reimburse me all the above expenses.”  

After writing this letter, APC paid
QIC a total of $2,000, via two separate cashier’s checks, toward the security
deposit, but never remitted the entire deposit.  At trial, Broach testified she
did not pay the entire deposit because of the issues with her bank account, her
payment of a friend’s burial expenses, and her husband’s illness.  According to
Broach, she relayed these concerns to Hunt, and he had no “problem” with
payment of the deposit over time.  

On May 10, 2006, QIC’s senior vice-president
and general counsel wrote a letter to Broach terminating the lease because APC
had failed to pay the security deposit.  He referenced a previous meeting after
the initial checks were dishonored, in which Broach promised to “come to” QIC’s
office on a regular basis and promptly pay the full deposit.  Broach testified
that Hunt told her the lease was terminated because QIC was not willing to
spend the money necessary to perform the build-out. 

In the meantime, at Broach’s request,
QIC had allowed APC, at no cost, to store in an unused area of the building some
furniture and fixtures, which would eventually be incorporated into the office
space and the build-out.  In its letter terminating the lease, QIC expressed it
was not obligated to, but would, refund the $2,000 paid toward the security
deposit upon APC’s retrieval of its property and demanded that Broach
immediately make arrangements to do so.  Broach testified QIC first told her it
would pay the $2,000 to a moving company to remove the property but then
represented it would pay her the $2,000 if she removed the property.

The property was not retrieved until late
October 2006, and each party faulted the other for this delay.  Broach testified
she tried several times between May and September 2006 to remove the property but
QIC represented each time was inconvenient, whereas QIC claimed it gave Broach
the opportunity to remove the equipment during this period.  In late September
2006, QIC told Broach that, if she did not remove the property by September 30,
2006, QIC would hire a company to dispose of it and charge the expenses against
the $2,000.  APC then filed this suit which first consisted of only a request
for injunctive relief to prevent disposal of the property and force QIC to pay
the moving expenses.  

The record reflects that, at the
hearing on APC’s request for injunctive relief, the parties agreed APC would retrieve
the property by a certain date in October 2006, and  it was finally removed on October
21.  Broach testified that, at the hearing, QIC agreed to return the $2,000
deposit when APC retrieved the property.  However, the record includes a letter
written by APC’s attorney to QIC’s attorney after the property was retrieved expressing
his understanding that QIC was not willing to refund the $2,000.  In any
event, APC’s attorney stated that APC would dismiss its suit if QIC would
return the $2,000.  The attorney also expressed his understanding that QIC’s
representative inspected the property and there was “no damage, the premises
were left clean and all parties were satisfied.”   It is undisputed that the
$2,000 was never returned to APC. 

Additionally, Broach testified she discovered
some of the property was missing, and Hunt told her that some QIC personnel had
entered the storage area and “helped themselves.”  QIC maintenance persons were
able to locate only some of the missing property in other areas of the building.

Broach amended her petition to add
various causes of action, including breach of contract, negligence, fraud, and
conversion.  Trial was to the bench.  On October 7, 2008, the trial court
signed a final judgment awarding APC $3,800.  QIC filed a motion for new trial,
which the trial court denied by written order.  

The trial court subsequently rendered
findings of fact and conclusions of law, including twelve findings relative to
APC’s claims.[1] 
Specifically, the court rendered separate findings that QIC was negligent in
the performance of duties owed APC and administration of the lease, breached
its contract with APC, committed fraud, and converted property owned by APC. 
With respect to each of these claims, the trial court rendered a separate
finding that QIC’s action was a proximate cause of APC’s damages and a separate
finding that $3,800.00 would reasonably compensate APC for its damages.

II.              
Analysis

In its first four issues, QIC contends
the evidence is legally and factual insufficient to support each finding
relative to its liability under the above-cited causes of action.  In its fifth
and final issue, QIC contends there was no evidence to support the finding of
$3,800 in damages for conversion.

Findings of fact in a bench trial have the same force and
dignity as a verdict on jury questions.  West v. Triple B Servs., LLP, 264
S.W.3d 440, 445 (Tex. App.—Houston [14th Dist.] 2008, no pet.).  In
reviewing a trial court’s findings for sufficiency of the evidence, we apply
the same standards applicable to reviewing evidence supporting a jury’s answer.
 Id. 

When examining a legal-sufficiency challenge, we review the
evidence in the light most favorable to the challenged finding and indulge
every reasonable inference that would support it.  City of Keller v. Wilson,
168 S.W.3d 802, 822 (Tex. 2005).  We credit favorable evidence if a reasonable fact finder
could and disregard contrary evidence unless a reasonable fact finder could
not.  Id. at 827.  There is “no evidence” or
legally-insufficient evidence when (a) there is a complete absence of evidence
of a vital fact, (b) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact, (c) the
evidence offered to prove a vital fact is no more than a mere scintilla, or (d)
the evidence conclusively establishes the opposite of the vital fact.  See Marathon Corp. v. Pitzner,
106 S.W.3d 724, 727 (Tex. 2003).  The fact finder is the sole judge of witness credibility
and the weight to give testimony.  City of Keller, 168 S.W.3d at 819.

In a factual-sufficiency review, we consider and weigh all
the evidence, both supporting and contradicting the finding.   Mar. Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406–07 (Tex. 1998).  We set aside the fact
finding only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust.  Pool v. Ford Motor Co., 715 S.W.2d
629, 635 (Tex. 1986).  

Preliminarily, we note that, at trial and on appeal, APC seemed
to argue that QIC committed various acts which support each cause of action.  In
its written findings, the trial court merely found that QIC was liable in
general for each cause of action.  QIC did not thereafter request that the
trial court make any additional findings to determine the basis for the
liability findings.  See Tex. R. Civ. P. 298 (providing that, after
trial court makes original findings of fact and conclusions of law, any party
may file a request for additional amended findings and conclusions).  Moreover,
in the judgment, the trial court did not specify any particular cause of action
on which judgment was rendered.

Further, at the conclusion of trial,
the court orally announced the basis for the  $3,800 damages award:  “$2,000
for the security deposit and $1,800 for the move-in and that will be it.”  However,
comments made by the court at the conclusion of a bench trial do not substitute
for written findings of fact and conclusions of law.  See In re Doe
10, 78 S.W.3d 338, 340 n.2 (Tex. 2002); In re W.E.R., 669 S.W.2d 716, 716
(Tex. 1984).  In its
written findings, the trial court did not identify the components of its
damages award but simply made a blanket finding of $3,800 for every cause of
action.  The $2,000 security deposit and $1,800 expenses for moving equipment
into the building were not the only damages which APC sought to recover.  Broach
also testified regarding, and APC asked the trial court to award, the
following:  $1,000 expended on architectural fees for build-out plans; $2,000
for removal of the property stored at the building; and $8,750 for the fair
market value of the items that were missing. 

We have attempted to glean the alleged
acts of QIC on which APC relied to support each cause of action.  We will
address whether the award of $3,800 may be upheld under any of these causes of
action based on any of the alleged acts upon which APC relied to support each
theory and for any of the components of damages requested by APC.  See Am.
Indus. Life Ins. Co. v. Ruvalcaba, 64 S.W.3d 126, 136–38 (Tex.
App.—Houston [14th Dist.] 2001, pet. denied) (determining whether evidence was
sufficient to presume findings on prerequisites necessary to establish more
general finding of fact made by trial court). 

A.        Breach of Contract

To prevail on a breach-of-contract
claim, a party must establish (1) a valid contract existed between the
plaintiff and the defendant, (2) the plaintiff tendered performance or was
excused from doing so, (3) the defendant breached the terms of the contract,
and (4) the plaintiff sustained damages resulting from the defendant’s breach. 
West, 264 S.W.3d at  446.

APC apparently claimed that QIC
committed a breach by wrongfully terminating the lease.  APC sought to recover
the amounts it spent preparing to consummate the lease, including architect
fees and costs to move equipment into storage at the building, and costs to
retrieve the property after termination.  However, the evidence conclusively
established QIC did not wrongfully terminate the lease because APC first failed
to pay the security deposit.  The lease specifically authorized termination if
APC “shall fail to pay when due any installments of Rent or other payment
required” thereunder.

We recognize the trial court was free
to believe Broach’s testimony that Hunt represented QIC would not deposit the
check she timely submitted for the deposit or the subsequent check, but would
wait for her to submit a cashier’s check.  However, this testimony was
immaterial because Broach admittedly never submitted cashier’s checks for the
full remainder of the deposit.  As we have mentioned, Broach wrote to Hunt in
mid-April—about two weeks after the deposit was due—explaining difficulties
that had prevented payment of the deposit and representing it would be paid via
installments over the next several days.  Although Broach testified that Hunt
had no “problem” with this arrangement, again, APC admittedly did not pay the
remainder of the deposit over the next several days.  It was not until a month
later—mid-May—that QIC notified APC it was terminating the lease for failure to
pay the deposit.  Although the evidence demonstrated QIC allowed APC additional
time after the due date to pay the deposit, APC presented no evidence showing
QIC agreed to hold the space open indefinitely until APC paid the entire
deposit. 

We also recognize that, according to
Broach, Hunt generally stated QIC terminated the lease because it was unwilling
to spend “thousands” on the build-out.  However, any such representation was not
necessarily inconsistent with the letter from QIC’s officer and counsel
terminating the lease due to APC’s failure to pay the security deposit.  As QIC
argued at trial, it was not unreasonable for QIC to refuse to expend money on
the build out considering APC had not even paid the security deposit and Broach
gave various excuses for the inability to do so.  Nevertheless, Hunt’s
representation did not negate that QIC had the right to terminate the lease due
to APC’s failure to pay the security deposit.

Apparently, APC also contends that
QIC breached the lease by failing to return the $2,000 after termination.  We
do agree the evidence supports this contention.   

At trial, QIC cited the following
provision of the lease when arguing it was allowed to use the security deposit
to “cover” its “expenses”:

Upon the occurrence of any default by Tenant, Landlord
may, from time to time, without prejudice to any other remedy, use the security
deposit to the extent necessary to make good any arrears of Rent, or to pay any
sums owed to Landlord under this Lease, or any damage, injury, expense or
liability caused to Landlord by any Tenant default.

 

  However, QIC did not present
evidence that it incurred any expenses resulting from APC’s default.  APC never
occupied the space because the lease was terminated before it even commenced or
the build-out was performed.  Additionally, the evidence showed that APC, not
QIC, paid for removal of APC’s property that was stored in a separate area of the
building.  Regardless of which party caused the delay in retrieval of the
property, QIC presented no evidence of damages caused by the delay.  Further,
QIC did not controvert the statement in the letter from APC’s counsel to QIC
after retrieval of the property that there was “no damage, the premises were
left clean and all parties were satisfied.”   

The lease also provided:

If Tenant shall fully and faithfully comply with all
the terms, provisions, covenants and conditions of this Lease including the
payment of any damages, or any cost or expense to restore the Leased Premises .
. . then the security deposit shall be returned to Tenant . . . .

 

Although not exactly clear, QIC
apparently relied on this provision when positing it was not obligated to
return the $2,000 even if APC removed its stored property.  Nonetheless, we
conclude that this provision did not authorize retention of the $2,000.

The only term of the lease with which
APC failed to comply was payment of the entire security deposit.  Because the
lease was terminated before it was commenced, APC could not have failed to
comply with any other terms.  Under QIC’s apparent reasoning, it was allowed to
retain the portion of the deposit that was paid because APC failed to
pay the entire deposit.  However, we cannot conclude that such a construction
is contemplated within the above-cited provision.

Because the provision is contained
within the section of the lease entitled “Security Deposit,” we conclude the
referenced “all the terms, provisions, covenants and conditions of the lease”
meant terms of the lease other than this particular section.  Reading the whole
“Security Deposit” section, we construe the purpose of the deposit was to
secure compliance with other terms of the lease and to compensate QIC for any
damages caused to the premises.  See Forbau v. Aetna Life Ins. Co.,
876 S.W.2d 132, 134 (Tex. 1994) (recognizing that court must read all
parts of a contract together to ascertain the parties’ agreement, and “[n]o one
phrase, sentence, or section [of a contract] should be isolated from its
setting and considered apart from the other provisions.”).  Therefore,
termination of the lease before commencement obviated the need for APC to pay the
remainder of the deposit.  In essence, QIC was not authorized to retain part of
the deposit to secure payment of the full deposit when the lease was never
commenced.

Consequently, the evidence is legally
and factually sufficient to uphold an award of $2,000 under a
breach-of-contract theory.   Accordingly,
we will next address whether the evidence is sufficient to support the trial
court’s finding on any other theory that would support recovery of more than
$2,000.

B.        Fraud

The elements of fraud are (1) a
material representation was made, (2) the representation was false, (3) when
the representation was made, the speaker knew it was false or made the
statement recklessly without any knowledge of the truth, (4) the speaker made
the representation with the intent that the other party should act on it, (5)
the party acted in reliance on the representation, and (6) the party thereby
suffered injury.  Aquaplex, Inc. v. Rancho La Valencia, Inc., 297 S.W.3d
768, 774 (Tex. 2009).  

At trial, APC suggested QIC
purportedly misrepresented that it intended to lease the space to APC and
perform the necessary build-out because it later reneged on this promise.  A
promise of future performance constitutes an actionable misrepresentation if
the promise was made with no intention of performing at the time it was made.  Id.
at 774.  However, as we have explained, the evidence conclusively established
APC first breached the lease by failing to pay the security deposit.  Therefore,
the fact that the lease was never consummated is not evidence QIC had no intent
to perform.

At trial, APC also suggested QIC made
a false representation that it would not negotiate the checks APC originally
submitted to pay the deposit and would wait for APC to deliver a cashier’s check. 
However, APC presented no evidence that its reliance on any such misrepresentation
caused the damages claimed in this suit.  The consequence of QIC’s action in
depositing the checks was merely that they were not honored.  As we have
discussed, APC failed to subsequently pay the full deposit via cashier’s check
or any other means, which justified termination of the lease.      

Finally, on appeal, APC primarily contends
QIC falsely represented it would securely store APC’s property in the building,
and APC would not have entered into the lease or stored the property if it had
known the items would not be secure.  However, APC cites no evidence QIC
promised the property would be secure but cites testimony showing only that QIC
allowed APC to store the property at the building.  To the extent QIC’s
agreement to store the property encompassed a representation it would be
secure, the fact that employees subsequently took some items, without more, did
not prove QIC had no intent to securely store the property.[2]
  

C.       Conversion

To establish conversion of personal
property, a claimant must prove (1) it owned or had legal possession of the
property or entitlement to possession, (2) the defendant unlawfully and without
authorization assumed and exercised dominion and control over the property to
the exclusion of, or inconsistent with, the claimant’s rights, (3) the claimant
demanded return of the property, and (4) the defendant refused to return the
property.  Hunt v. Baldwin, 68 S.W.3d 117, 131
(Tex. App.—Houston [14th Dist.] 2001, no pet.).  The usual measure of damages for conversion is the fair market value of the property at the time and place of conversion.  United Mobile Networks, L.P. v. Deaton,
939 S.W.2d 146, 147–48 (Tex. 1997). 

To support its conversion claim, APC suggests
QIC’s threat to dispose of the property in storage if APC did not retrieve it
by a certain date was an unlawful exercise of dominion and control over the
property.  However, the evidence negates that QIC committed conversion relative
to this threat because it did not dispose of the property and APC did
eventually retrieve it, albeit after some delay. 

At trial, APC sought to recover the
fair market value of the equipment that was missing after APC retrieved its
property from storage at the building.  However, APC presented no evidence to
support a finding that QIC was liable for converting the property.[3]

The only evidence APC presented
relative to the missing property was that unnamed QIC employees took some
items.  “The general rule is that an employer is liable for its employee’s tort
only when the tortious act falls within the scope of the employee’s general
authority in furtherance of the employer’s business and for the accomplishment
of the object for which the employee was hired.”  Minyard Food Stores, Inc.
v. Goodman, 80 S.W.3d 573, 577 (Tex. 2002). For an employee’s acts to be
within the scope of employment, “the conduct must be of the same general nature
as that authorized or incidental to the conduct authorized.”   Id.

APC presented no evidence the QIC employees
took APC’s property in furtherance of QIC’s business or that their actions were
of the “same general nature” as their authorized duties or incidental thereto. 
See id.  To the contrary, the representation by Hunt to Broach that the
employees “helped themselves” indicated the employees’ actions were in
furtherance of their own interests.[4]


D.        Negligence

The elements of a negligence
claim are existence of a legal duty, breach of that duty,
and damages proximately caused by the breach.  W. Inv., Inc. v. Urena,
162 S.W.3d 547, 550 (Tex. 2005).  At trial, APC did not advance any argument
particular to a negligence claim.  However, on appeal, APC urges that QIC
breached a duty to safeguard APC’s property while it was in storage.  Assuming
without deciding that QIC owed any duty to safeguard the property, APC
presented no evidence of a breach.  

The only witness who testified
concerning storage of the property was a maintenance supervisor presented by
QIC, who explained the storage area was “under lock and key,” only he and
management personnel had the key, and QIC employees did not have “free reign”
of the area.  APC presented no evidence of any further methods QIC should have
exercised to prevent employees from taking the property.  Moreover, there was
no evidence regarding the identity of the employees who took the property or
the time frame in which it was taken to even establish what precautions QIC purportedly
should have exercised to prevent removal of the property.  Without more, the
mere fact that employees may have “helped themselves” did not prove QIC was
negligent. 

III.           
Conclusion

In sum, we sustain QIC’s first,
third, and fourth issues challenging legal sufficiency of the evidence to
support the findings that it committed negligence, fraud, and conversion,
respectively.  Therefore, we need not consider QIC’s factual-sufficiency
challenge to these findings or its fifth issue challenging the damages awarded
for conversion.  We also sustain QIC’s second issue challenging legal
sufficiency of the evidence to support the breach-of-contract finding to the
extent the trial court implicitly found QIC committed a breach by terminating
the lease and need not consider its factual-sufficiency contention.  We
overrule QIC’s legal and factual sufficiency challenges to the
breach-of-contract finding to the extent the trial court implicitly found QIC
breached the lease by refusing to return the $2,000 security deposit.  

Accordingly, we modify the trial
court’s judgment to reduce the damages award from $3,800 to $2,000 and affirm
as modified.








                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

Panel consists of Justices Yates,
Seymore, and Brown.

 









[1]
The thirteenth and last finding was merely a correct finding that QIC had
waived a counterclaim previously asserted.  In the judgment, the trial court
ordered that QIC take nothing on the counterclaim.





[2]
APC also suggests on appeal that QIC falsely promised to pay the $2,000 to a
mover for removal of APC’s property or return this money to APC.  We need not
consider this contention because we have already concluded APC was entitled to
return of the deposit under the terms of the lease.





[3]
As QIC contends, the trial court’s oral comments indicate it found no damages
relative to the missing property.  Nonetheless, because the trial court made a
general written finding that QIC committed conversion, causing $3,800 in
damages, and APC presented some evidence the fair market value of the missing
equipment exceeded this amount, we have evaluated whether the evidence is
sufficient to uphold this award under a conversion theory.  





[4]
APC also pleaded QIC converted “monies,” apparently referencing the $2,000.  Again,
we need not address this allegation due to our conclusion regarding refund of
the $2,000 under the terms of the lease.