**Opinion issued April 25, 2019**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-17-00837-CV

———————————

### UNITED COMMERCE CENTERS, INC., Appellant

### V.

### J.R. BIRDWELL CONSTRUCTION AND RESTORATION, Appellee

On Appeal from the 122nd District Court
Galveston County, Texas
Trial Court Case No. 15-CV-0757

## MEMORANDUM OPINION

United Commerce Centers, Inc. is appealing the judgment rendered against it after a bench trial on J.R. Birdwell Construction and Restoration's breach of contract claim. On appeal, UCC argues that the trial court erred by rendering judgment against UCC on Birdwell's breach of contract claim because there is no evidence, or

insufficient evidence, that UCC breached the contract and there is no evidence, or insufficient evidence, to support the trial court's award of $574,951 to Birdwell. We affirm the trial court's judgment.

## Background

In 2010, UCC purchased an insurance policy from Travelers Lloyds Insurance Company (Travelers) which covered wind and hail damage to a commercial building located in Dallas (the Building). After the Building's roof was damaged by wind and hail in 2011, UCC hired Birdwell as its general contractor and put Birdwell "in charge of the restoration and renovation of damages sustained to [the Building]" with respect to its roof damages (the Agreement).

Under the terms of the Agreement, UCC warranted that it would file "a claim with [Travelers] for damages [it] believe[d] were caused by a peril covered by [its] insurance policy" and

> If the insurance company agrees to pay the claim for damage to the property, [UCC is] required to have [Birdwell] perform such work at the prices determined by [Travelers]. [UCC] also agree[s] to allow [Birdwell] to perform any repairs ultimately prescribed by [Travelers], which includes the estimate of repair and [Travelers'] adjuster's report, as set forth in [Travelers'] claim file. By reference, said adjuster's report and estimate become part of this agreement. Material and labor specifications will follow upon [Travelers'] approval.

UCC further agreed that, as its general contractor, Birdwell would "obtain any appropriate property insurance damage estimate and will perform any necessary restoration and/or renovation work in accordance with [Travelers'] determination"

2

and "work with the Public Adjuster as a building consultant at no additional cost," if UCC elected to retain a public adjuster in the process. UCC agreed that it would "not have another person or entity perform any of the work included in this claim" and that all work "will be completed by [Birdwell]."

The contract also states that "[t]he dollar amount of the Agreement is the amount allowed by [UCC's] insurance carrier for the approved scope of loss, which is equal to the Replacement Cost Value, plus any supplements in accordance with the provisions of this Agreement," and UCC "agrees and accepts that the Public Adjuster's Fee will be in addition to the costs to repair the building." The parties also interlineated the following terms: "Adjusters fee will be absorbed by J.R. Birdwell" and "Work will be performed for insurance proceeds."

After Birdwell inspected the Building, Birdwell invited Clay Morrison, a public adjuster at Morrison & Morrison, Inc. (Morrison), to inspect the Building and provide a second opinion as to the damage. Morrison inspected the Building in September 2012 and confirmed that the Building had suffered extensive hail and wind damage. UCC subsequently hired Morrison to act as its public adjuster with respect to pursuing a claim with Travelers for damages to the Building.

On January 26, 2013, Morrison notified Travelers of UCC's claim for damages to the Building. On January 31, 2013, Morrison and Birdwell attended an inspection of the Building with Travelers' adjuster, Kevin Brown. Birdwell took

core samples from the Building's roof and shared those samples with Morrison and Brown. These core samples demonstrated to Brown, as he later wrote in Travelers' claim file, that all layers of the Building's roof were saturated and that the roof, therefore, should be replaced. Brown, who told Morrison during the inspection that he believed that the roof was a total loss, also prepared an estimate demonstrating his determination that the scope of loss was total and prescribed a complete removal and replacement of the roof.

Travelers removed Brown from the file and appointed a new adjuster to re-evaluate the loss. Travelers' second adjuster, Kirk Speary, determined that the roof did not need to be replaced because it could be repaired by coating it with foam. Pursuant to Speary's report, Travelers' paid UCC $235,503.72 to cover the cost of repairing the roof. Travelers also paid UCC an additional $1,000 after it determined that UCC had previously paid its deductible on a different claim.

Morrison, UCC, and Birdwell agreed that Travelers' prescription to apply another layer of foam to the Building's roof would not be a proper repair. According to Morrison, such a repair would not only be ineffective, it would also violate local building codes. As a result, Morrison continued working on the claim for the rest of 2013, seeking to persuade Travelers to change its position.

After UCC and Travelers were unable to resolve their disagreement over the scope of repair during the adjustment process, Morrison suggested that UCC meet

4

with an attorney, Jeff Raizner, to discuss the possibility of filing a lawsuit against Travelers. According to Birdwell representative David Conrad, UCC was concerned about the costs associated with the litigation and had requested a meeting with Birdwell to discuss the amount of Raizner's attorney's fees and to determine whether there "would there be enough funds left for [Birdwell] to reroof [the] building correctly" if UCC retained Raizner to resolve its dispute with UCC.

Conrad testified that he met with UCC's Grace Tsai[1] and Grace indicated that UCC would not retain Raizner's firm to pursue a lawsuit against Travelers unless Birdwell would agree that it would repair the damage to the Building for whatever amount Travelers paid in insurance proceeds, minus Morrison's and Raizner's fees. Birdwell agreed to Grace's requested modification. According to Conrad, he and Grace agreed that "once [UCC] had received the paperwork from [Travelers] or the public adjuster showing the amounts that [Travelers] decided to pay[,] that [Birdwell] would roof [the Building] for the remaining amount that was left over after the attorney and the public adjuster were paid."

Conrad further testified:

Q. All right. And so, did you talk about the economics of the transaction, how it would work out if there were a lawsuit?

A. Absolutely. We talked about that there's a PA fee. And now that if she decided to involve the attorney that there's going to be an

---

[1]     UCC's owners are Grace and Peter Tsai and their son, Joseph, is UCC's senior vice-president.

attorney fee and that there will be enough money as long as the insurance company decides to total the whole roof and pay for the whole roof for us to roof it with her only paying her deductible.

Q.	And did she ask you to agree to that?

A.	Yes. We discussed it. Absolutely.

Q.	And so, what did you say when she asked you that?

A.	I told her that we could do it for the remaining amount.

In April or May of 2014, UCC hired Raizner to pursue its dispute with Travelers. Raizner subsequently sent a demand letter to Travelers on UCC's behalf demanding $2,739,773.12 which would, among other things, cover the $1,604,990.55 needed to replace the roof.

After UCC and Travelers were unable to resolve their dispute, UCC filed a lawsuit against Travelers in 2014 seeking to recover the replacement value of the roof and asserting various causes of action related to Travelers' handling of the insurance claim. During discovery in that case, UCC obtained Travelers' claim file, which included Brown's estimate and his report stating that the roof was a total loss and it needed to be replaced.

The parties mediated their dispute and, as a result of mediation, Travelers and UCC executed a confidential settlement agreement on May 27, 2015 in which

Travelers agreed to pay UCC an additional $2.5 million to settle all of UCC's claims, including its insurance claim, for a total of $2,736,503.72.[2]

After UCC received its settlement payment, Conrad had multiple conversation with UCC's vice president, Joseph Tsai. about replacing the roof. Conrad testified:

Q.  Okay. And what was the purpose of those communications?

A.  Well, once they had received the paperwork from the insurance company or the public adjuster showing the amounts that the insurance company decided to pay that we would roof it for the remaining amount that was left over after the attorney and the public adjuster were paid.

Q.  As you had discussed with the owner of the building, Grace Tsai?

A.  Yes.

Conrad testified that he repeatedly told Joseph that Birdwell was ready, willing, and able to replace the roof for the insurance proceeds, as the parties had agreed, but Joseph refused to allow Birdwell to proceed with the work.

Q.  And did Mr. Tsai ever acknowledge that Birdwell had a contract to do the work?

A.  Yes.

Q.  What did he say?

A.  He said -- we talked about the numbers and he had told me that he had somebody that would do it for a significant smaller amount dollar-wise. And I told Joseph, I said, "Joseph, we have

---

[2]  The $2.5 million payment was in addition to the $236,503.72 that Travelers had already paid to UCC.

a contract that y'all have signed to agree to do it for insurance proceeds." And he told me he didn't care that we had a contract.

Q. Did he say that once?

A. No. A lot more than once.

Joseph testified at trial and corroborated Conrad's testimony.

Q. Mr. Conrad came out and met with you and talked with you about doing the work at [the Building] after UCC got the insurance money, didn't he?

A. Yes, Conrad approached us.

Q. Right. And he came out and said, "We're ready to do the work now that you have the insurance proceeds," didn't he?

A. Yes.

. . . .

Q. . . . . Mr. Conrad came out to you and said, "You've got the insurance proceeds. We're ready to begin the work and we're doing it under the contract." And you said, "We're not going to honor the contract," didn't you?

A. Yes.

In addition to refusing to allow Birdwell to replace the roof, UCC also initially refused to pay Morrison's and Raizner's fees. Morrison eventually sued UCC for breach of contract and Birdwell intervened in the suit and asserted a breach of contract claim against UCC, relating to the same project. UCC eventually paid Raizner $675,000 in fees and $225,000 to Morrison.

After a bench trial on Birdwell's breach of contract claim, the trial court rendered judgment against UCC and awarded Birdwell $574,951 in damages, pre-judgment interest, post-judgment interest, and attorney's fees. The trial court also entered extensive findings of fact and conclusions of law.

**Standard of Review**

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). When challenged, a trial court's findings of fact are not conclusive if there is a complete reporter's record on appeal. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (holding implied findings can be challenged when there is complete reporter's record). We review a trial court's findings of fact under the same legal-sufficiency standard used when determining whether sufficient evidence exists to support an answer to a jury question. *See Catalina*, 881 S.W.2d at 297; *Nguyen*, 317 S.W.3d at 269–70.

An appellant may not challenge a trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *See BMC Software*, 83 S.W.3d at 794. In an appeal from a bench trial, we review the conclusions of law de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *See id.*

9

When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the trial court's findings and indulge every reasonable inference to support them. *Id.* at 822. We may not sustain a legal sufficiency challenge unless the record demonstrates: (1) a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. Because it acts as the fact finder in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 567 (Tex. 2000). If the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

### Breach of Contract

In its first issue, UCC argues that the trial court erred by rendering judgment against UCC on Birdwell's breach of contract claim because there is no evidence, or

10

insufficient evidence, supporting two elements of Birdwell's claim. Specifically, UCC argues there is no evidence, or insufficient evidence, that Birdwell tendered performance under the Agreement and that UCC failed to comply with its contractual obligations.

## A. Applicable Law

"To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach." *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, No. 01-17-00555-CV, 2018 WL 6695813, at *9 (Tex. App.—Houston [1st Dist.] Dec. 20, 2018, no pet. h.). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Universal Plant Servs.*, 2018 WL 6695813, at *10 (quoting *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex. App.—Dallas 2005, pet. denied)).

## B. Contract Interpretation

In construing a written contract, a court "must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v.*

11

*Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless. *Id.* We begin our analysis with the contract's express language. *Id.* And we analyze the provisions of a contract "with reference to the whole agreement." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005); *see also Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) ("No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."). "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

"Deciding whether a contract is ambiguous is a question of law for the court." *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016) (per curiam) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). If a contract is worded so that it can be given a certain or definite meaning, then it is

12

unambiguous, and we construe it as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). If, however, after applying the pertinent rules of construction, the contract is subject to two or more reasonable interpretations, then it is ambiguous and presents a fact issue regarding the parties' intent. *Id.*

### 1.    Condition Precedent

UCC argues that its obligations under the Agreement were contingent upon Travelers first agreeing to pay UCC's damages claim and that this condition precedent was not satisfied because Travelers never agreed to pay the claim.[3] UCC contends that, because this condition precedent was not satisfied, UCC's obligation to allow Birdwell to repair/replace the roof was not triggered and, therefore, UCC could not have breached the Agreement by refusing to allow Birdwell to perform the work. Birdwell argues that Travelers paid the claim when it executed the settlement agreement with UCC which resolved all of UCC's claims against Travelers, including the damages claim covered by the Agreement.

---

[3]    "Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 64 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)); *see also Roberts v. Clark*, 188 S.W.3d 204, 212 (Tex. App.—Tyler 2002, pet. denied) (explaining that when promise is subject to condition precedent, promisor has no liability or obligation and promisor cannot breach contract until contingency is performed or occurs).

13

Pursuant to the Agreement, UCC agreed that it would file a claim with Travelers for damages to the roof that UCC believed were covered by its insurance policy and "[i]f [Travelers] agrees to pay the claim for damage to the property," UCC would have Birdwell "perform such work at the prices determined by the insurance company."

The record reflects that the Building's roof was damaged during a hailstorm, and Morrison, UCC's public adjuster, submitted an insurance claim to Travelers on UCC's behalf seeking compensation for damages to the roof, i.e., the amount of money necessary to replace the roof. After UCC and Travelers were unable to resolve their dispute regarding the scope of the loss covered by the policy, UCC filed a lawsuit against Travelers seeking to recover the cost of replacing the roof and asserting various causes of action related to Travelers' handling of the insurance claim. Travelers and UCC executed a confidential settlement agreement in which Travelers agreed to pay UCC an additional $2.5 million to settle all of UCC's claims, including the insurance claim.

UCC contends that the settlement agreement and payment is not evidence that Travelers agreed to pay the claim because Travelers expressly denied all liability for the claim and the settlement agreement states that it "does not constitute, and shall not be construed to reflect, the adoption of any coverage position." However, the Agreement, not the insurance policy, or the settlement agreement, controlled the

14

relationship between UCC and Birdwell. The Agreement does not require Travelers to formally acknowledge liability for the claim or adopt UCC's coverage position. The plain language of the Agreement contemplated only that Travelers would give some amount of money to UCC to resolve the claim for damages to the Building's roof and that Birdwell would complete the repairs for that amount, minus some fees. *See Valence Operating Co.*, 164 S.W.3d at 662.

Viewing the evidence in the light most favorable to the trial court's findings and indulging every reasonable inference to support them, we conclude that there is legally sufficient evidence supporting the trial court's findings that when Travelers settled UCC's insurance claim in the amount of an additional $2.5 million in order to resolve all of UCC's claims against Travelers this constituted the payment of the "claim for damage" referred to in the Agreement. *See City of Keller*, 168 S.W.3d at 822.[4]

### 2. Birdwell's Performance of its Contractual Obligations and UCC's Failure to Comply with the Agreement

UCC argues that, even if Travelers paid the insurance claim, Birdwell cannot prevail on its breach of contract claim because there is no evidence, or insufficient evidence, that Birdwell tendered performance under the Agreement or that UCC

---

[4] Because we have concluded that there is sufficient evidence that Travelers paid the claim, we do not need to determine whether the contractual provision is a condition precedent or merely a covenant.

15

failed to comply with the Agreement. Specifically, UCC argues that the parties agreed that Travelers would determine the scope of the work to be performed by Birdwell pursuant to the Agreement and Travelers initially determined that the roof should be repaired by covering it with a layer of foam for approximately $236,000. Therefore, Birdwell's offer to replace the roof for the amount in the settlement agreement does not demonstrate that Birdwell tendered performance and UCC's refusal to allow Birdwell to replace the roof for insurance proceeds in the settlement agreement is not evidence that UCC failed to comply with the Agreement.

Under the terms of the Agreement Birdwell was required to "perform any necessary restoration and/or renovation work in accordance with [Travelers'] determination" and "perform any repairs *ultimately* prescribed by [Travelers], which includes the estimate of repair and [Travelers'] adjuster's report, as set forth in [Travelers'] claim file. By reference, said adjuster's report and estimate become part of this agreement." [Emphasis added.]

Although the Agreement's dollar amount was initially defined as the amount Travelers allowed "for the approved scope of loss, which is equal to the Replacement Cost Value, plus any supplements in accordance with the provisions of this Agreement," the parties agreed to modify the Agreement after UCC and Travelers were unable to resolve the claim through the regular claim adjustment process. According to Conrad, he and Grace Tsai agreed that UCC would hire attorney

16

Raizner to pursue litigation against Travelers and that "once [UCC] had received the paperwork from [Travelers] or the public adjuster showing the amounts that [Travelers] decided to pay[,] that [Birdwell] would roof [the Building] for the remaining amount that was left over after the attorney and the public adjuster were paid." They also agreed that UCC would only have to pay its deductible because, "as long as the insurance company decide[d] to total the whole roof and pay for the whole roof," there would be enough money left over to pay Birdwell to replace the roof after Morrison's and Raizner's fees were deducted from Travelers' payment.

In this case, the record reflects that Travelers' adjuster, Brown, determined that "the [Building's] roof warrants replacement due to hail and water penetration." Brown's estimate states that the Building's roof was a total loss and it had to be totally removed and replaced. The trial court found that Travelers determined that the roof was a total loss and prescribed and approved total removal and replacement of the roof, as evidenced by, among other things, Brown's report, estimate, and Travelers' claim file.[5] The trial court also found that UCC and Birdwell "agreed to modify the Agreement such that Birdwell was entitled to repair or replace the damage at the Building in exchange for UCC paying to Birdwell the Net Insurance Proceeds." The trial court had previously defined the term "Net Insurance Proceeds"

---

[5]    Morrison also testified that Brown told him during the January 2013 inspection that the roof was a total loss.

as "whatever Travelers paid in insurance proceeds, net not only of Morrison's fee but also net of Raizner's fee."

UCC contends that Birdwell cannot rely on Brown's report or his estimate to establish Birdwell's performance obligations under the Agreement, i.e., the scope of work, because Travelers never adopted Brown's assessment that the roof was a total loss that had to be replaced. Instead, Travelers replaced Brown with another adjuster who determined that the roof only needed to be repaired by coating it with foam, and Travelers adopted that position for purposes of the adjustment process and ensuing litigation with UCC. According to UCC, there is no evidence that Travelers—as opposed to one of its adjusters—ever determined that the roof was a total loss. The Agreement, however, does not require Travelers to have formally adopted Brown's finding that the roof was a total loss. Furthermore, UCC's position is not consistent with the plain language of the contract which states that "any repairs ultimately prescribed by" Travelers includes the estimate of repair and adjuster's reports in Travelers' claim file. It is undisputed that Brown's report is part of Travelers' claim file. Thus, Brown's report is some evidence of the "repairs ultimately prescribed by" Travelers.

UCC further contends that the Agreement could not have been orally modified because paragraph 4 states that the contract can "be changed only by written instruments signed by both parties." A written contract, however, "may be modified

18

by a subsequent oral agreement even though [the contract] provides it can be modified only by a written agreement." *Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 151 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (quoting *Robbins v. Warren*, 782 S.W.2d 509, 512 (Tex. App.—Houston [1st Dist.] 1989, no writ)). Conrad's testimony is some evidence supporting the trial court's finding that the parties modified the terms of the Agreement and that Birdwell was entitled to replace the roof for insurance proceeds, minus Morrison's and Raizner's fees.[6]

The trial court found that UCC did not allow Birdwell to replace the roof after UCC settled its insurance claim with Travelers and that "UCC's refusal to allow Birdwell to repair the Building's roof constituted a material breach of the Agreement by UCC." It is undisputed that Birdwell repeatedly told UCC that it was ready, willing, and able to replace the roof for the insurance proceeds, as the parties had agreed, but UCC's vice president informed Birdwell that UCC was not going to honor the contract and he refused to allow Birdwell to proceed with the work.

Viewing the evidence in the light most favorable to the trial court's findings and indulging every reasonable inference to support them, we conclude that there is

---

[6] UCC also contends that, under the modified agreement, UCC's and Birdwell's obligations were contingent upon Travelers "decid[ing] to total the whole roof and pay for the whole roof." To the extent that UCC's and Birdwell's obligations were contingent upon these terms, as UCC contends, Brown's report and estimate are some evidence that Travelers decided to total the whole roof and pay for the whole roof.

19

legally sufficient evidence supporting the trial court's findings that (1) Birdwell was entitled to replace the Building's roof because Travelers had determined that the roof was a total loss, (2) UCC had agreed to pay Birdwell the insurance proceeds paid to it by Travelers, minus Morrison's and Raizner's fees, and (3) UCC refused to allow Birdwell to replace the roof after UCC received its settlement payment from Travelers. *See City of Keller*, 168 S.W.3d at 822.

### 3. Notice of Termination

UCC argues that there is no evidence, or insufficient evidence, that Birdwell had begun its "work" pursuant to the Agreement before UCC canceled the Agreement in December 2015[7] and, therefore, there is no evidence or insufficient evidence that UCC breached the contract. Specifically, UCC argues that the purpose of the Agreement was to remedy any damages to the roof that were caused by the wind and hailstorm, i.e., a major roof repair/replacement. UCC contends that Birdwell had not commenced any work pursuant to the Agreement because Birdwell had not begun repairing the roof by applying a layer of foam or replacing the roof

---

[7]     In December 2015, UCC sent a notice of termination to Birdwell in which UCC purported to cancel the Agreement on some yet-to-be-determined date in the future and it invoked paragraph 8's liquidated damages provision. Specifically, the notice states that "[t]he effective date of cancellation shall be (5) days after the [Birdwell] Lawsuit is resolved, and all appeals of the [Birdwell] Lawsuit are final." Although UCC challenges the trial court's finding that UCC sent the notice of termination on December 15, 2015, the exact date of the notice is immaterial for purposes of our analysis.

20

when it received the notice of termination in December 2015. UCC further contends that the services that Birdwell had performed prior to that date were outside the Agreement's scope of work.

Paragraph 8 of the Agreement provides that UCC can terminate the Agreement "prior to the commencement of any work by" Birdwell and that, if UCC exercises this right, UCC is only obligated to pay Birdwell "twenty percent (20%) of the amount approved by the insurance carrier for repairs."[8] Thus, under the plain language of the Agreement, UCC may only cancel the Agreement and invoke paragraph 8's liquidated damages provision if UCC terminates the contract "prior to the commencement of any work by" Birdwell. Paragraph 8 does not allow UCC to cancel the Agreement after Birdwell has commenced "any work" under the contract.

The term "work," which is not defined by the Agreement, is generally understood to mean a task or tasks to be undertaken. *See Valence Operating Co.*,164 S.W.3d at 662 (stating undefined contract terms will be given their plain, ordinary, and generally accepted meanings). The plain language of the Agreement requires Birdwell, as UCC's General Contractor with respect to the claim for roof damage, to undertake certain tasks to assist UCC in the claims process, including "obtain[ing] any appropriate insurance damages estimate" and acting as Morrison's "building

---

[8]    Paragraph 8 also states that UCC can cancel the Agreement "without penalty" if cancellation occurs no more than 3 days after the Agreement is executed. The parties do not dispute that this provision is inapplicable.

21

consultant at no additional cost to" UCC. Such tasks fall within the plain, ordinary, and generally accepted meaning of the term "work," as used in Paragraph 8.

The trial court found—and the evidence is undisputed—that Morrison and Birdwell attended an inspection of the Building with Travelers' adjuster, Brown, on January 31, 2013. Birdwell, who was acting in the capacity of Morrison's building consultant pursuant to the Agreement, took core samples from the Building's roof during the inspection and shared those samples with Morrison and Brown. Brown relied on these core samples when he prepared his report and prepared an estimate, stating that the scope of loss was total, and recommending that the Building's roof be removed and replaced in its entirety. Based on these findings, the trial court further found that "UCC's purported cancellation of the Agreement was ineffective . . . because Birdwell already had commenced work pursuant to the Agreement in January 2013."[9]

Viewing the evidence in the light most favorable to the trial court's findings and indulging every reasonable inference to support them, we conclude that there is some evidence supporting the trial court's findings that Birdwell had begun performing work required by the Agreement as early as January 31, 2013 and,

---

[9] The trial court also found that paragraph 8 was inapplicable because "UCC's purported cancellation of the Agreement did not even purport to be effective when sent, but specified a date in the future, which date had not been reached by the time the Court tried this case."

therefore, UCC was not able to avail itself of Paragraph 8's cancellation and liquidated damages provision by sending the notice in December 2015 in which it purportedly canceled the Agreement on some undetermined date in the future.[10]

We overrule UCC's first issue.

## Damages Award

In its second issue, UCC argues that there is no evidence, or insufficient evidence, to support the trial court's award of $574,951 in lost profits to Birdwell.

"Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). Broadly speaking, lost profits reflect income from lost business activity, less expenses that would have been attributable to that activity. *Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 18 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although lost profits need not be susceptible to exact calculation, the injured party must do more than show that it suffered some lost profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). The amount of the loss must be shown by competent evidence with reasonable certainty. *Id.* "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.*

---

[10] In light of this conclusion, we do not need to address whether any minor repairs that Birdwell made to the roof also constituted work under the Agreement.

Here, Birdwell's owner, Josh Birdwell, testified that Birdwell lost between $266,246.82 to $755,793.42 in profits because of UCC's refusal to allow Birdwell to replace the roof. He offered four alternative calculations. Three of those calculations were based on repair estimates prepared by Brown and John Minor, UCC's roof expert in its ligation with Travelers. Mr. Birdwell testified that he determined that Birdwell had lost profits of $266,246.82, $655,010.11, or $755,793.42. Mr. Birdwell testified that he arrived at these numbers by starting with each estimate's projected repair cost and then deducting Birdwell's expenses that would have been attributable to replacing the roof. The fourth calculation is based on the remaining limits under the Travelers' policy. In that case, Mr. Birdwell testified that he determined that Birdwell had lost profits of $650,249.33 by deducting Birdwell's expenses from the "repair cost at policy limits." Mr. Birdwell also detailed the type and amount of each expense with respect to all four calculations and he provided worksheets detailing his calculations.

Considering Mr. Birdwell's testimony and the worksheets he prepared, we conclude that Birdwell provided the court with objective facts, figures, and data from which the amount of lost profits could be ascertained and, therefore, the amount of Birdwell's lost profits was shown with "competent evidence with reasonable certainty." *Heine*, 835 S.W.2d at 84. The trial court's finding that Birdwell had $574,951 in lost profits is within the range of evidence presented at trial. *See KMG*

*Kanal–Muller–Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 396 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding award that fell between damage figures presented by parties fell within range of evidence at trial and was supported by legally sufficient evidence); *see also Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) ("In determining damages, the [fact finder] has discretion to award damages within the range of evidence presented at trial").

We overrule UCC's second issue.

## Conclusion

We affirm the trial court's judgment.


Russell Lloyd
Justice


Panel consists of Justices Lloyd, Kelly, and Hightower.